J-S57044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: P.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: L.E., MOTHER | No. 1194 EDA 2014 |

Appeal from the Decree entered March 19, 2014
In the Court of Common Pleas of Monroe County
Orphans' Court at No: 88 DP 2013, 2 O.C.A. 2014

BEFORE:  DONOHUE, MUNDY, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:  **FILED OCTOBER 29, 2014**

L.E. (Mother) appeals from the decree entered March 19, 2014, which terminated involuntarily her parental rights to her minor child P.E. (Child), born in September of 2013.[1]  We affirm.

Prior to Child's birth, in November of 2010, Father was accused of sexually abusing two of Child's older siblings.  Criminal charges were filed against Father, and Mother also was charged in connection with the abuse. The couple's five children were placed in foster care, and Mother's parental rights to the children were terminated on February 13, 2012.  In July of 2013, Mother was tried and convicted of endangering the welfare of children

_____

[1] The decree also terminated the rights of Child's father, D.E. (Father), who is not a party to the instant appeal.

and corruption of minors.[2] On February 18, 2014, she was sentenced to two to five years in prison. During Mother's incarceration, in August of 2013, it was discovered that Mother was pregnant with Child. Child was taken into foster care upon his release from the hospital, and placed with three of Mother's other children.

Meanwhile, Children & Youth Services (CYS) became aware that Mother had yet another child, a daughter, who was residing in North Carolina with Child's maternal grandmother (Grandmother). Mother had not reported the existence of this child, who was born in September or October of 2012, to CYS.

On January 6, 2014, CYS filed a petition to terminate Mother's parental rights to Child. A hearing was held on March 14, 2014, and the orphans' court entered a decree terminating Mother's rights on March 19, 2014. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issue on appeal.

> Whether the [l]ower [c]ourt erred by terminating Mother's [p]arental [r]ights within 5 ½ months of the birth of the child, despite Mother's compliance with the family service plan to the best of her ability, and despite a lack of clear and convincing

---

[2] The exact circumstances surrounding Mother's criminal charges are not contained in the certified record. However, Mother acknowledges that "[h]er convictions stemmed from acts of omission regarding the sexual abuse her husband had perpetrated on two of her daughters." Mother's Brief at 10.

evidence that termination best served the child's emotional needs and welfare?[]

Mother's Brief at 6.

Our Supreme Court recently reiterated the applicable standard of review as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the

needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002). Such incapacity may be demonstrated by a parent's incarceration. As our Supreme Court has explained,

> incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

***In re Adoption of S.P.***, 47 A.3d 817, 830 (Pa. 2012) (citations omitted).

With respect to Section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

Instantly, Mother argues that the orphans' court "erred in finding that [Mother] did not meet her responsibilities as a parent while incarcerated." Mother's Brief at 8. Mother insists that her incarceration cannot, by itself, support the termination of her parental rights, and that she has "evidenced a clear and settled purpose to provide care, support and love for" Child. *Id.* While Mother admits that the orphans' court's "findings regarding [Mother's] incarceration and the circumstances surrounding [Child's] birth arguably justify the court's determination that [CYS] sustained its burden under" Section 2511(a)(2), she contends that "it should be clear from the record that the lower court erred in determining that [CYS] established its burden under" Section 2511(b). *Id.* at 11. Mother then goes on to list the "steps [she] has taken to establish a connection with" Child, including completing parenting and life skills classes, completing drug and alcohol counseling,

filing for divorce from Father, and taking "affirmative steps to establish visitation" with Child. *Id.*

We first address whether the orphans' court erred by terminating Mother's rights with respect to Section 2511(a)(2). Here, the orphans' court concluded that Mother's parental rights should be terminated because of her present incarceration, and because of her history of failing to protect Child's older siblings from abuse. Orphans' Court Opinion, 4/28/2014, at 4. The court emphasized that "Mother has provided no care to the minor child since his birth, and will be unable to provide any care at least through the time of her release from incarceration." *Id.* at 5.

The orphans' court also noted "other concerns regarding Mother's ability to care for [Child] appropriately even after her release." *Id.* The court found that Mother intentionally concealed her pregnancies with both her sixth child and Child, and expressed concern that Mother "chose to have two more children with Father after he was charged with sexually assaulting two of their five children." *Id.* at 5-6. The orphans' court observed that the sixth child was placed with Grandmother, and that Grandmother "had another relative living in her home who had a criminal record, [sic] that prevented the placement of [Child] into that home." *Id.* at 5. The court reasoned that Mother had failed to show any remorse or concern for her actions during the termination hearing, and that, "[a]lthough Mother has not yet had the opportunity to care for [Child] since he was born, we are

convinced by her prior actions, inactions and testimony, that she will not be able to provide essential care to [Child] in the future." *Id.* at 7.

Our review of the record supports the orphans' court's findings. The record reflects that Mother was first incarcerated on July 23, 2013, and that she is serving a sentence of two to five years in prison, including time served. N.T., 3/14/14, at 19, 36-37. Mother received 174 days of credit for time served and, at a minimum, will have to be incarcerated for "about another year and a half" from the date of her termination hearing. *Id.* at 27. Mother's incarceration has rendered her incapable of parenting Child from the time Child was born, and it is unclear precisely when Mother will be released.

Moreover, considering Mother's prior history, we agree with the orphans' court that it is unlikely that Mother will ever be able to parent Child appropriately. While Mother testified that she had completed a "life application" class, and a "parenting and family skills class," while in prison, she was unable to articulate with any detail what she learned in these classes. *Id.* at 39. For example, when asked about her life application class, Mother responded, "It's a life application. It just helps with skills to help better yourself and to help you with just day-to-day life and just education about a broad amount of everything." *Id.* When asked about her parenting class, Mother explained that it involved, "Parenting and family skills, specifically, for parent and child, and it helps with how to protect your

child and various and various different subjects and parenting. . . . Just, I just learned how to parent. They also talk about discipline, talk about raising your child, different things." *Id.* Mother's explanation of how drug and alcohol counseling has improved her parenting abilities was likewise vague. Mother stated that the counseling was, "just for education, because you know, raising children, you need as much education as possible." *Id.* at 40.

Mother also indicated during the termination hearing that she had filed for divorce from Father. *Id.* However, as observed by the orphans' court, Mother filed for divorce only after having an additional two children with Father. Mother's explanation for not getting a divorce earlier was that she was unable to afford it. *Id.* at 41. Mother struggled to explain how she had become more financially secure in recent months, despite being incarcerated. *Id.* at 46. Mother claimed that she saved up money that she had received from Father's father for doing yard work and "things in the house." *Id.*

In addition, the record confirms the orphans' court's conclusion that Mother had engaged in deceitful behavior by concealing the birth of her sixth child, and by hiding her pregnancy with Child. Mother claimed during her termination hearing that she did not know she was pregnant with Child until her incarceration. *Id.* at 45. However, Mother was approximately seven months pregnant at the time she was incarcerated. *Id.* at 50. According to

Mother, she "wasn't even showing." *Id.* at 51. Mother then went on to claim that her pregnancy was not discovered until three weeks after her intake, when she was "approximately 33 weeks," or over eight months pregnant. *Id.* at 51-52. In contrast, CYS caseworker Jennifer Payne-Fetherman testified that she contacted Grandmother during this period. *Id.* at 9. Grandmother was aware that Mother was pregnant, and she indicated that Mother intended to send Child to live with family in Oklahoma. *Id.* Grandmother informed Ms. Payne-Fetherman that Mother had been trying to "stay under the radar, since [CYS was] still involved, and she was involved in the criminal proceedings." *Id.* at 9-10.

Similarly, Mother's sixth child was born "while the criminal charges were pending and [Mother] was out on bail," and the child was given a last name different than Mother's. *Id.* at 8, 31, 47. Ms. Payne-Fetherman testified that Mother had told her specifically that she had not had any additional children after the initial five but before Child. *Id.* at 6-7. When asked if she ever reported the existence of the sixth child to CYS, Mother stated that she did not, because "I wasn't in contact with anyone. It was like a period of -- there was nothing going on at that particular period." *Id.* at 49. Mother testified that she placed her sixth child in the care of Grandmother, not because she was attempting to hide the child, but because she "thought it would be best and safest for [the sixth child] to remain with my mother." *Id.* at 42. However, Mother could not provide a

clear explanation as to why this would be the case. Mother elaborated as follows.

> "Because of the legal issues that I was facing; all of the things that I was facing. . . . Like I said, just legal issues. There wasn't a way for me to -- it just wasn't feasible because she was an infant, and in her best interest to be with my mother at that time."

*Id.* at 48.

Moreover, Child may have faced a considerable safety risk living with Grandmother, as Mother's brother lives with Grandmother, and he has an "extensive drug criminal history." *Id.* at 16.

In sum, the record reveals that Mother is presently incapable of being a parent. This incapacity is demonstrated by Mother's incarceration, her tragic history with her five oldest children, and what the orphans' court concluded were her attempts at hiding her two youngest children from CYS. This incapacity has left Child without parental care and control for his entire life, and it was reasonable for the orphans' court to conclude that Mother cannot, or will not, remedy this incapacity. Thus, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

We now consider whether termination was warranted under Section 2511(b). With respect to the bond analysis pursuant to section 2511(b), our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."

***T.S.M.***, 71 A.3d at 268 (citation omitted). The Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. The ***T.S.M.*** Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Here, the orphans' concluded that it would be in Child's best interest if Mother's parental rights were terminated. ***Id.*** The court found that Child is bonded with his foster parents, that he has no bond with Mother, and that he is unlikely to develop a bond given Mother's incarceration. ***Id.*** Additionally, the orphans' court observed that termination "would ensure [Child] remain in the pre-adopt home with his other siblings, where he has a bond, where he is safe and where he has resided since birth." ***Id.***

Again, the record supports the orphans' court's decision. Ms. Payne-Fetherman explained that she has had the opportunity to see Child interact with his siblings, and that they "adore" Child, and "love having him there." N.T., 3/14/2014, at 23. Ms. Payne-Fetherman testified that Child is "extremely, absolutely" bonded with his siblings, and "without a doubt, absolutely" bonded with his foster parents. ***Id.*** Conversely, there was no evidence presented at the termination hearing that Child was bonded with

Mother, and it is highly unlikely that any bond exists, given that Child was removed from Mother immediately after his birth.

Further, we agree that it would be difficult for Mother and Child to develop such a bond during her incarceration. Mother's visits with Child consist of putting a phone receiver up to Child's ear and allowing Mother to speak to him from behind a pane of glass. *Id.* at 25. At the time of the hearing, these visits took place every two weeks or so, and "usually last[ed] anywhere from 15 minutes to 30 minutes, depending on [Child] and his mood that day." *Id.* at 18-19. Mother testified that, while she tried to have "special visits" with Child that did not take place behind glass, she was informed that "the facility doesn't have a clean enough, or an appropriate enough, room; otherwise they would allow it, but they can't allow it because they don't have the setup for it." *Id.* at 44. Mother also admitted that she had not mailed Child any cards or letters, and had not "had any contact at all from the jail" other than visits. *Id.* at 47-48.

Thus, it is clear that it would be in Child's best interest if Mother's parental rights were terminated. To conclude otherwise would deny Child his place in a loving and stable family, and would condemn Child to a state of uncertainty for the first two to five years of his life, based solely on speculation that Mother, who has never actually parented Child, who has already proven her dramatic incompetence as a parent, and with whom Child has no bond, will one day be able to care and provide for him.

We therefore conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2) and (b), and we affirm the decree of the orphans' court.

Decree affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/29/2014